**Lorimer L. and Pamela F. McLAUGHLIN, Appellants,**

v.

**Masayoshi OKUMURA, Appellee.**

**Nos. S–12708, S–12777.**

Supreme Court of Alaska.

Dec. 11, 2009.

Rehearing Denied Jan. 29, 2010.

40. 20 AAC 05.834(c), .836(4).

41. *Id.*

94

Robert John, Law Office of Robert John, Fairbanks, for Appellants.

Masayoshi Okumura, pro se, Tokyo, Japan.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, WINFREE, and CHRISTEN, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

Upon learning that judgment debtors Lorimer and Pamela McLaughlin were about to receive settlement proceeds related to the malpractice of their former attorney Arthur Robson, judgment creditor Masayoshi Okumura renewed his efforts to execute on his fraud judgment against them after nine years of inactivity. The superior court granted Okumura's motion for a new writ of execution, allowing him to execute on the McLaughlins' settlement proceeds. Attorney Michael MacDonald, who claimed to have assisted in obtaining those settlement proceeds, moved to have his 40% contingency fee subtracted from the proceeds prior to Okumura's levy, and the superior court denied his request. The superior court also refused to prevent Okumura from executing against a piece of real estate owned by the McLaughlins. The McLaughlins appeal each of these three decisions.

Because Okumura's reasons for not executing sooner were sufficient, we affirm the superior court's grant of Okumura's new writ of execution. For the same reason, we affirm the superior court's subsequent refusal to prevent Okumura from executing on the debtors' real estate. And because MacDonald has not adequately demonstrated that he has a claim to 40% of the McLaughlins' settlement proceeds, we also affirm the superior court's denial of his requested fee.

## II. FACTS AND PROCEEDINGS

### A. Background Facts and Prior Proceedings[1]

Lorimer and Pamela McLaughlin purchased a historic gold camp near Fairbanks

1. Much of this factual background is derived from our opinions in two prior related cases,

in 1982 and lost title to it via foreclosure in 1990 due to malpractice by their attorney, Arthur Robson. Believing that they still had viable title, the McLaughlins, still represented by Robson, contracted with foreign investor Masayoshi Okumura to build an "Aurorium" facility on the land where tourists could view the Northern Lights. Apparently acting on Robson's advice, the McLaughlins did not tell Okumura about the foreclosure. The land was repossessed and Okumura sued the McLaughlins. Robson defended the McLaughlins without revealing his own culpability, and in 1993 Okumura obtained a total judgment of $1,008,536.05 against the McLaughlins for fraud.

Still represented by Robson, the McLaughlins filed for Chapter 7 bankruptcy in 1993. The McLaughlins' debt to Okumura was not discharged in their bankruptcy case because it was considered to have resulted from fraud.[2] Okumura has levied on his judgment against the McLaughlins, but the judgment has not yet been entirely satisfied.

While the McLaughlins' bankruptcy case was pending, Okumura sued Robson for his role in the botched Aurorium deal. Robson was defended in that suit by law firm Hughes, Thorsness, Gantz, Powell & Brundin ("Hughes Thorsness"). It would later be alleged that in the course of its representation of Robson and in furtherance of Robson's fraudulent scheme to avoid personal liability, Hughes Thorsness prepared for Robson's signature a pleading in the McLaughlins' bankruptcy case withdrawing the McLaughlins' motion to clarify that they still owned legal malpractice claims against Robson.[3] This withdrawal was later reversed and the bankruptcy court held that Robson could be sued by the McLaughlins and their bankruptcy estate, but this did not occur until after Robson had already settled with Okumura for $900,000 and thereby exhausted his liability insurance. Okumura's judgment against the McLaughlins was deemed partially satisfied and reduced by $900,000 due to Okumura's settlement with Robson.

The McLaughlins subsequently sued Robson for malpractice and fraud, subject to a court-approved agreement that any recovery would be split evenly between them and their bankruptcy estate. Attorney Michael MacDonald pursued the claim under a contingency fee agreement. The McLaughlins obtained a $3,571,429.33 judgment against Robson in 2001, which we affirmed on appeal in 2002.[4]

Robson's liability insurance already having been exhausted, the McLaughlins executed on Robson's assets, including his unlitigated claims for contribution against attorney Ken Lougee and law firm Hughes Thorsness.[5] The McLaughlins asserted that Robson had claims for contribution against Lougee and Hughes Thorsness for the role they allegedly played in the malpractice and fraud that ultimately resulted in the McLaughlins' judgment against Robson.

Accordingly, the McLaughlins and their bankruptcy trustee sued Lougee and Hughes Thorsness as assignees of Robson's claims for contribution. Attorney Michael Flanigan pursued these claims under a 40% contingency fee agreement approved by the bankruptcy court. Following a dismissal, appeal, reversal, and remand,[6] in 2006 the parties agreed to a settlement. The bankruptcy trustee sought permission from the bank-

*Compton v. Chatanika Gold Camp Props.*, 988 P.2d 598, 599–600 (Alaska 1999) and *McLaughlin v. Lougee*, 137 P.3d 267, 268–69 (Alaska 2006).

2. *See* 11 U.S.C. § 523(a)(2)(A) (2006) (debts resulting from fraud by the debtor are not dischargeable in bankruptcy).

3. This factual issue was never fully litigated because the McLaughlins' action against Hughes Thorsness and Ken Lougee, an attorney at the firm, ended in a settlement following our remand in *McLaughlin*, 137 P.3d at 269, 280 (reversing the superior court's grant of defendant Hughes Thorsness's 12(b)(6) motion for failure to state a claim and remanding for further proceedings).

4. *Robson v. McLaughlin*, Mem. Op. & J. No. 1114, 2002 WL 31630774 (Alaska, November 20, 2002).

5. We adopt the parties' practice of referring to this as the "Lougee cause of action" and the ensuing litigation and settlement as the "Lougee litigation" and "Lougee settlement."

6. *McLaughlin*, 137 P.3d at 280.

ruptcy court to settle the claims against Lougee and Hughes Thorsness for $160,000. Forty percent of the settlement proceeds were to go to Flanigan pursuant to his fee agreement, with the remainder to be split evenly between the McLaughlins and their bankruptcy estate. The bankruptcy court approved this arrangement in December 2006.

### B. This Case

The current controversy arose when Okumura renewed his attempts to collect on his 1993 judgment against the McLaughlins after receiving notice of the Lougee settlement in late 2006. Okumura moved for a new writ of execution and a writ of attachment against the McLaughlins' anticipated share of the Lougee settlement proceeds. Superior Court Judge Mark I. Wood granted Okumura's motion for a writ of execution, which was issued in February 2007. The McLaughlins appeal, arguing that Okumura was not entitled to a new writ because he had not shown good cause for his delaying execution on the judgment against them for more than five years.

Subsequently, MacDonald, who had represented the McLaughlins in their malpractice suit against Robson, filed a motion requesting that 40% of the McLaughlins' share of the Lougee settlement be released directly to him as attorney's fees rather than being subject to execution by Okumura. The superior court denied this request, and the McLaughlins appeal.

Finally, in May 2007 Okumura attempted to execute against a piece of real property held by Pamela McLaughlin, and the McLaughlins moved to quash Okumura's writ of execution and cancel the public sale of the property. The superior court denied their motion and the McLaughlins appeal, arguing once again that Okumura had not shown good cause for delaying execution on the judgment against them for more than five years. This appeal, which was filed separately, was consolidated with the appeal of the first two issues.

## III. STANDARDS OF REVIEW

The McLaughlins argue that the superior court erred in allowing Okumura to execute on his judgment against them after more than five years. "The superior court's decision to allow execution on a judgment more than five years old is a mixed question of law and fact." [7] On appeal, "[q]uestions of law are reviewed de novo," and "[q]uestions of fact are reviewed under the clearly erroneous standard." [8]

The McLaughlins also contend that the superior court erred in holding that MacDonald's attorney's lien did not apply to the McLaughlins' settlement proceeds from the Lougee litigation. To the extent that the resolution of this issue depends on questions of fact, we employ the clearly erroneous standard of review.[9] But once factual questions are resolved, "[t]he question of [lien] priority is a legal one, to which we apply our independent judgment," and we will "adopt the rule of law that is most persuasive in light of precedent, reason, and policy." [10]

## IV. DISCUSSION

### A. The Superior Court Did Not Err in Granting Okumura a New Writ of Execution With Which To Collect on His 1993 Judgment Against the McLaughlins.

#### 1. Proceedings

After receiving notice of the pending Lougee settlement in November 2006, Okumura, whose 1993 judgment against the McLaughlins had not been fully satisfied or discharged in bankruptcy, moved for a renewed writ of execution on the judgment under Alaska Civil Rule 69(d)(1) [11] and a writ

7. *Brotherton v. Brotherton,* 142 P.3d 1187, 1189 (Alaska 2006).

8. *Id.*

9. *Id.*

10. *Falconer v. Adams,* 20 P.3d 583, 584 (Alaska 2001) (citations omitted).

11. Alaska Rule of Civil Procedure 69(d)(1):
Whenever a period of five years shall elapse without an execution being issued on a judgment, no execution shall issue except on order of the court in the following manner:

of attachment against the McLaughlins' anticipated share of the Lougee settlement proceeds under Alaska Civil Rule 69(d)(5).[12] Okumura's original writ of execution had expired, and he apparently had not executed on the judgment since 1997, nine years earlier. Explaining the nine-year delay since his last attempt to execute on the judgment, Okumura asserted [13] that he had garnished Lorimer McLaughlin's wages "through September 1997" but that "[e]fforts to locate nonexempt assets of the debtors were unsuccessful after that date" and he had "lost track of the [McLaughlins'] physical address and whereabouts."

Both Flanigan, who represented the McLaughlins and their bankruptcy estate in the Lougee litigation, and MacDonald, who pursued the McLaughlins' claim against Robson, opposed Okumura's attempt to execute. Through MacDonald, the McLaughlins contended that Okumura could not show good cause for his nine-year delay in execution under both Civil Rule 69(d)(1), which requires a judgment creditor in Okumura's position to state "the reasons for failure to obtain a writ for a period of five years," and AS 09.35.020, which provides that execution on a judgment after five years may issue only "if the court determines that there are just and sufficient reasons for the failure to obtain the writ of execution within five years." The McLaughlins argued that Okumura's failure to execute on his judgment within the five-year period following his last execution was not justified because during that period he could have levied on the McLaughlins' cause of action against Robson, their judgment against Robson, the money they levied from Robson, or the claim for contribution against Lougee and Hughes Thorsness that they levied from Robson. They also argued that "the equities in this case" favored them because Okumura received all of Robson's insurance money, some of which should have gone to satisfy their malpractice judgment against Robson.

Okumura responded, asserting that his delay in execution was justified because "[f]or all practical purposes, [the McLaughlins] had no visible presence in Alaska after 1998" and "[a]wareness of litigation and knowledge of tangible assets in [the McLaughlins'] possession are not synonymous." In February 2007 Superior Court Judge Mark I. Wood granted Okumura's motion for a writ of execution. The federal bankruptcy court released the McLaughlins' $44,485.33 share of the Lougee settlement to the clerk of the superior court rather than to the McLaughlins. Okumura's writ of execution issued on February 13, 2007.

The McLaughlins filed a motion for reconsideration, which the superior court denied in March 2007. The superior court explained that Okumura had "attempted to locate the McLaughlins at three different times using the postal service" and that "[w]ithout knowledge of their whereabouts, Okumura was unable to determine what, if any assets were available to be levied under the judgment." It found these to be "just and sufficient reasons" for Okumura's failure to execute and declined to impose a higher burden of

(1) The judgment creditor shall file a motion supported by affidavit with the court where the judgment is entered for leave to issue an execution. The motion and affidavit shall state the names of the parties to the judgment, the date of its entry, the reasons for failure to obtain a writ for a period of five years and the amount claimed to be due thereon or the particular property of which possession was adjudged to the judgment creditor remaining undelivered.

12. Alaska Rule of Civil Procedure 69(d)(5):
At the time of filing the motion for leave to issue execution or at any time thereafter before the final order is entered, the judgment creditor may cause the property of the judgment debtor to be attached and held during the time said motion is pending and until the final order is entered. Such attachment shall be made in accordance with these rules and applicable statutes, and for the purpose of such attachment the judgment shall be deemed an implied contract for the direct payment of money. In the event that the court shall order that execution be issued, it shall further order that any property of the judgment debtor attached hereunder shall be sold for the satisfaction of such execution and the peace officer shall apply the property attached by the peace officer or the proceeds thereof upon the execution.

13. Okumura was represented in the proceedings below by an attorney, John Connors, though Okumura appears before us pro se.

proof on Okumura. It further stated that "Okumura cannot be found to have had knowledge of the McLaughlins' court case against attorney Robson without some evidence that Okumura was actually aware of the case."

The McLaughlins now appeal, arguing that the superior court erred in granting Okumura's motion for a writ of execution [14] because Okumura did not provide sufficient justification for his nine-year delay and because allowing execution would be inequitable given the history of this case.

### 2. Executing on a judgment after a lapse of five years or more

The requirements for executing on a judgment after a lapse of five years or more are provided in Alaska Civil Rule 69(d) and AS 09.35.020. Civil Rule 69(d) mandates that, "[w]henever a period of five years shall elapse without an execution being issued on a judgment," a judgment creditor seeking to execute must file a motion specifying, among other things, "the reasons for failure to obtain a writ for a period of five years." Alaska Statute 09.35.020, which Civil Rule 69(d) implements,[15] provides:

> When a period of five years has elapsed after the entry of judgment and without an execution being issued on the judgment, no execution may issue except by order of the court in which judgment is entered. The court shall grant the motion if the court determines that there are just and sufficient reasons for the failure to obtain the writ of execution within five years after the entry of judgment.

█ Alaska Statute 09.35.020 "does not impose a definitive statute of limitations on the execution of judgments but leaves the balancing of rights and duties between the parties to the discretion of the trial court." [16] We have said that "[i]f a judgment creditor seeks to execute upon a valid judgment after a lapse of five years ... good cause must be demonstrated for the delay," [17] but also that a creditor "may be able to demonstrate *any number of valid reasons* supporting its decision to delay formal execution." [18]

We have found good cause for a creditor's delay in several different situations: where execution "would be futile because no assets were available to be executed upon," [19] where there existed "a high level of animosity" between the parties,[20] where the debtor's appeal of the judgment at issue was still ongoing,[21] and where "the party opposing the execution of judgment was in control of the preconditions to the filing of the motion to execute." [22]

The McLaughlins rely heavily on *Magden v. Alaska USA Federal Credit Union.*[23] In *Magden,* we affirmed the granting of a creditor's motion for a writ of execution after more than five years because the debtor had "offered no evidence in her opposition that [during the relevant five-year period] she possessed any non-exempt assets upon which [the creditor] could execute" which meant that "any attempts by [the creditor] to enforce the judgment would have been fu-

14. The McLaughlins' point on appeal regarding this issue states that "[t]he trial court erred in granting [Okumura's] Motion for Writ of Attachment" against the McLaughlins' share of the Lougee settlement, and it is Okumura's motion for a writ of attachment that they include in their excerpt. But their argument on appeal focuses on whether the superior court erred in granting Okumura's motion for a writ of execution given his multi-year delay, not whether the superior court erred in allowing Okumura to attach the Lougee settlement proceeds, specifically.

15. *Brotherton v. Brotherton,* 142 P.3d 1187, 1190 (Alaska 2006) ("Alaska Statute 09.35.020 is implemented by Civil Rule 69(d).").

16. *Id.* at 1191 n. 19.

17. *State, Dep't of Revenue, Child Support Enforcement Div. ex rel. Inman v. Dean,* 902 P.2d 1321, 1325 (Alaska 1995).

18. *Id.* (emphasis added).

19. *Brotherton,* 142 P.3d at 1190 n. 14 (citing *Magden v. Alaska USA Fed. Credit Union,* 36 P.3d 659, 662 (Alaska 2001)).

20. *Id.* at 1190–91.

21. *Id.* at 1191.

22. *Id.* at 1190 n. 14 (citing *Guttchen v. Gabriel,* 49 P.3d 223, 227 (Alaska 2002)).

23. 36 P.3d 659 (Alaska 2001).

tile."[24] That is, in *Magden* we held that a debtor's lack of assets may constitute good cause for a creditor's delay in execution.

But the McLaughlins take *Magden* several steps further by interpreting it to mean that "[i]f there were assets to levy and they were not levied, then just and sufficient reason[s] for failure to execute cannot be shown" and thus that "it was incumbent on Okumura to prove . . . that the McLaughlins had no assets available for execution during the five-year period." But such a broad reading of *Magden* is unwarranted and would be inconsistent with our statement that a creditor "may be able to demonstrate *any number of valid reasons* supporting its decision to delay formal execution."[25] A debtor's lack of assets is not the only possible "just and sufficient" reason for a creditor's delay in execution.[26]

As the superior court recognized when rejecting the McLaughlins' motion for reconsideration, "[i]n any situation, whether assets are available or otherwise, the judgment creditor need only demonstrate just and sufficient reasons to the satisfaction of the court."

### 3. The reasons Okumura presented for his delay in execution were "just and sufficient."

The superior court found that "Okumura's inability to locate the McLaughlins set out just and sufficient reasons for Okumura's failure to levy against any assets." We agree.

Okumura's attorney stated via affidavit that Okumura executed on his judgment against the McLaughlins by garnishing Lorimer McLaughlin's wages from "1996 through September 1997," but that "efforts to locate non exempt assets of the debtors after that were unsuccessful." Okumura's attorney further claimed that "[r]equests through the postal service for a current mailing address for the debtor[s] [were] unsuccessful [in] 1998 and in March 2003" and that "[a] later request was returned by the postal service indicating that no forwarding address was available for the debtors." The McLaughlins were eventually personally served with Okumura's writ of execution in Kailua Kona, Hawaii. Though Okumura did not present any documentation of his efforts to find the McLaughlins beyond the affidavit of his attorney, the superior court did not clearly err in finding that Okumura did in fact try and fail to locate the McLaughlins, who had moved out of state. Nor did the superior court err in determining that Okumura's inability to locate the McLaughlins constituted a just and sufficient reason for his delay in execution.

The McLaughlins argue that the superior court clearly erred in finding that there was insufficient evidence to show that Okumura had been aware that the McLaughlins possessed the Robson and Lougee causes of action. They contend that Okumura cannot show just and sufficient reasons for his delay because he failed to execute on those assets. But whether or not Okumura was aware that the McLaughlins possessed causes of action, he was justified in waiting until tangible funds actually became available for execution.

### 4. The McLaughlins' equitable argument

The McLaughlins argue that allowing Okumura to execute on their settlement proceeds would be unfair because they "engaged in extensive efforts and thereby brought the [Lougee] litigation to fruition." But the fact that a debtor has expended effort in obtaining funds does not somehow exempt those funds from execution—otherwise execution would rarely be possible.

The McLaughlins also argue that allowing Okumura to execute would be inequitable because "Okumura pocketed $900,000 from attorney Robson through Robson's insurance, some of which should have gone to

24. *Id.* at 662.

25. *State, Dep't of Revenue, Child Support Enforcement Div. ex rel. Inman v. Dean,* 902 P.2d 1321, 1325 (Alaska 1995) (emphasis added).

26. Alaska R. Civ. P. 69(d). For example, in *Brotherton v. Brotherton* we held that a creditor had good cause for her delay in execution despite the fact that she did not show that the debtor lacked assets. 142 P.3d at 1190–91.

the McLaughlins." They cite out-of-state authority for the proposition that "writs of execution should be quashed where illegalities or inequities disfavor further enforcement of the judgment." [27] But where a court exercises its equitable power to restrain execution on a judgment, it should be because inequity would arise from execution, not because the underlying judgment is itself inequitable.[28] The McLaughlins essentially argue that Okumura's judgment against them is itself inequitable because Okumura received Robson's insurance proceeds. But the proper way to make such an attack on the underlying judgment would be through an appeal of that judgment or a Civil Rule 60(b) motion. More importantly, this issue has already been litigated—the McLaughlins asked both the superior court and the bankruptcy court to declare Okumura's judgment against them satisfied following his settlement with Robson, and although the superior court reduced the judgment, both courts declined to declare the judgment entirely satisfied.

Accordingly, we affirm the superior court's decision to grant Okumura a new writ of execution.

### B. The Superior Court Did Not Err in Allowing Okumura To Execute on a Piece of Pamela McLaughlin's Real Property.

#### 1. Proceedings

Following Okumura's receipt of the Lougee settlement proceeds, an updated writ of execution was issued on May 3, 2007 that reflected the remaining balance of Okumura's judgment against the McLaughlins. Okumura then began the process of executing against a piece of real property in Fairbanks owned by Pamela McLaughlin.

The McLaughlins objected, moving to quash the writ of execution and cancel the notice of public sale of the property, arguing that Okumura had not shown good cause under Civil Rule 69(d)(1) and AS 09.35.020 [29] for his delay in executing on that piece of property. Okumura responded that he had already satisfied his burden of showing good cause for his delay in execution during the litigation discussed above surrounding his request for a new writ of execution. He also asserted that he had good cause for not previously executing against the Fairbanks property because the McLaughlins had listed no real estate in their bankruptcy proceeding and because the property had changed hands several times over the previous decade.

The McLaughlins responded that "[t]he prior ruling of the court on the previous Civil Rule 69(d) issue is not dispositive" because the existence of the Fairbanks property had not been brought to light during the previous litigation over whether Okumura had good cause for his delay. MacDonald asserted that the existence of the real property "certainly would have been raised as part of the defenses raised the last time around" but that the McLaughlins "did not advise [him] that they had any real estate" in Fairbanks. The McLaughlins also contended that the various transfers of the Fairbanks property did not excuse Okumura's failure to timely execute on it because regardless of the transfers, "as a matter of law, [Okumura] had a judgment lien against the [property] by virtue of [his] recorded judgment."

27. The McLaughlins cite *Schmidt v. Bretzlaff,* 208 Mich.App. 376, 528 N.W.2d 760, 762 (1995) (stating that "[a] writ of execution will be quashed if it would be illegal or inequitable to permit its further use or enforcement," but reversing lower court's decision to quash writ based on promissory estoppel) and *Creditor's Adjustment Co. v. Newman,* 185 Cal. 509, 197 P. 334, 337–38 (1921) (stating that "[t]he right of the court to recall the execution cannot be doubted if the issuance was improperly or inadvertently made or authority therefore revoked," but affirming lower court's vacation of writ of execution based on res judicata).

28. *See* 30 Am.Jur.2d *Executions, Etc.* § 272 (footnotes omitted):

> Courts have the equitable power to restrain execution upon a judgment in a proper case. For example, if allowing the execution to proceed would result in an injustice, a court may invoke its equitable power to restrain the execution.... However, a court will not restrain the execution on a judgment simply on the ground that it was unjust, irregular, or erroneous, or because the court could, in deciding the same case, have come to a different conclusion than the court entering the judgment.

29. *See supra* subpart IV.A.2.

The superior court denied the McLaughlins' motion to quash the writ of execution and cancel the public sale, explaining that Okumura "had already shown just and sufficient reasons after a more than five year lapse in obtaining a writ of execution" and that he was "not required to once again make a showing under Civil Rule 69(d) until 5 years have elapsed since the issuance of a writ of execution." The McLaughlins appeal.

**2. Okumura was not required to show separate good cause for his delay in executing against Pamela McLaughlin's real property because he had already obtained a new writ of execution.**

The McLaughlins argue that "the trial court's piggybacking the real-property execution on top of its rationale for justifying the settlement-monies execution puts the cart before the horse." They seem to assume that AS 09.35.020's requirement that a creditor show good cause for a five-year-or-more delay in execution is asset-specific—that is, that a creditor must show separate good cause for delay related to each piece of the debtor's property he wishes to levy. Thus, they reason, Okumura must show separate good cause for his delay in execution on the Fairbanks property despite the fact that he already made a good cause showing in order to obtain the February 2007 writ of execution just a couple months earlier. But the plain language of AS 09.35.020 simply does not support this interpretation, and the McLaughlins cite no other authority for it.

Alaska Statute 09.35.020 requires a creditor to show good cause for delay in order to obtain a new writ of execution "[w]hen a period of five years has elapsed after the entry of judgment and without an execution being issued on the judgment." [30] Okumura satisfied this requirement and obtained a new writ of execution in February 2007. That writ of execution allowed Okumura to levy any of the McLaughlins' non-exempt assets to satisfy his judgment. Accordingly, it was simply not necessary for Okumura to once again make a showing of good cause under AS 09.35.020 in May 2007 when he sought to levy the Fairbanks property—a period of five years had not elapsed without an execution being issued. The McLaughlins' only recourse was to pursue their appeal of the superior court's granting of Okumura's February 2007 writ of execution discussed above.

The McLaughlins also contend that "the failure of Okumura to have discovered the real property and executed upon it during the five-year-period after judgment not only defeats the real-property execution but also completely undermines any claim of just cause and due diligence in regard to the settlement-monies execution." That is, they argue that the February 2007 writ of execution should not have issued because Okumura could not show good cause for his delay in execution given his failure to execute against the Fairbanks property during the five-year period. But the McLaughlins admittedly did not bring up the existence of the Fairbanks property during the litigation surrounding the February 2007 writ of execution, so that argument is waived.

Accordingly, we affirm the superior court's denial of the McLaughlins' motion to quash Okumura's writ of execution and cancel the public sale of Pamela McLaughlin's Fairbanks real property. We need not examine whether Okumura had separate good cause for not previously executing on the Fairbanks property.

**C. The Superior Court Did Not Err in Concluding that MacDonald Was Not Entitled To Receive 40% of the McLaughlins' Settlement Proceeds from the Lougee Litigation as Attorney's Fees.**

**1. Proceedings**

In 1996 the McLaughlins entered into a fee agreement with MacDonald specifying that he would pursue their malpractice claims against Robson on a 40% contingency fee basis. In 2000 the bankruptcy court approved of an arrangement whereby the McLaughlins' bankruptcy trustee would

30. *See supra* subpart IV.A.2.

(1) employ Michael MacDonald, attorney for Pamela and Lorim[e]r McLaughlin, individually, to pursue the estate's causes of action against Arthur Lyle Robson ("Robson"), (and other responsible parties arising out of Robson's representation of the debtors) on a contingency fee basis (1/3 prior to appeal, 40% after appeal, and 50% after appeal concludes), plus costs; and (2) share the litigation proceeds, net of such fees and costs, with the debtor on a 50–50 basis.

The bankruptcy trustee agreed to split the proceeds of any recovery with the McLaughlins "because of the nagging issues as to the extent to which the pre-petition and post-petition malpractice belonged to the [McLaughlins] versus the Trustee, and because the [McLaughlins] were more familiar with the underlying facts." MacDonald prosecuted the suit against Robson, which resulted in a $3,571,429.33 judgment in 2001. MacDonald successfully defended that judgment against Robson's appeal in 2002.[31] MacDonald levied the Lougee cause of action from Robson in 2003. In 2004 MacDonald applied to the bankruptcy court for payment of 50% fees (the judgment having been affirmed on appeal) on the bankruptcy estate's 50% share of $168,768.47 that had been levied from Robson up to that point.

Also in 2004 the bankruptcy trustee applied for and was granted permission to employ Flanigan "as special counsel to pursue the estate's causes of action against Ken Lougee, and his firm Hughes Thorsness, et al. on a 40% contingency fee basis plus costs." The application stated that "Flanigan has a separate fee agreement with the Debtors, on the same 40% term as the trustee." The application further stated that "[t]here is no overlap between the attorney fees owed attorneys MacDonald and Flanigan. In other words, MacDonald will not claim an attorney fee on any recovery from the Lougee litigation." Flanigan pursued the Lougee litigation, which ended in a settlement that was approved by the bankruptcy court in December 2006. Flanigan received 40% of the $160,000 total settlement, and the remainder was to be split evenly between the McLaughlins and their bankruptcy estate (meaning, effectively, that the estate and the McLaughlins each paid a 40% contingency fee to Flanigan on their share). The McLaughlins' $44,485.33 portion of the settlement money was released to the superior court rather than to the McLaughlins due to Okumura's writ of attachment.

After Okumura obtained his February 2007 writ of execution but before he actually received the McLaughlins' $44,485.33 share of the Lougee settlement, MacDonald filed a motion with the superior court requesting that 40% of the $44,485.33 be released directly to him as attorney's fees. Because his 1996 fee agreement with the McLaughlins specified that he was entitled to 40% of any recovery on the McLaughlins' judgment against Robson, and because the Lougee cause of action was levied from Robson pursuant to that judgment, MacDonald argued that he was entitled to 40% of the McLaughlins' share of the Lougee settlement.

Okumura opposed MacDonald's motion, arguing that "[t]he origin and disbursement of [the Lougee settlement] funds have already been determined by the Bankruptcy Court" and that MacDonald's motion was "a second effort to recover [ ] fees from funds that have already been subject to another attorney's contingency fee." Okumura pointed out the language in the bankruptcy trustee's application to retain Flanigan stating that "MacDonald will not claim an attorney fee on any recovery from the Lougee litigation" and noted that MacDonald had not objected to that language.

MacDonald countered that "[t]he bankruptcy Trustee's fees are separate and distinct from the [McLaughlins']" and that the fee approval application quoted by Okumura "relate[d] to approval of attorney's fees for the bankruptcy trustee's one half of the settlement with Hughes Thorsness, not the fees that might be owing to MacDonald & Levengood by the McLaughlin[ ]s from their one half of the recovery." He also appealed to

31. *Robson v. McLaughlin,* Mem. Op. & J. No. 1114, 2002 WL 31630774 (Alaska, November 20, 2002).

equity, arguing that his fee request was justified because "[t]here [was] only a comparatively small recovery on the [Robson] claim when compared to the amount of work that was put in by [his] firm" and "if it were not for the efforts of [his] firm there would be nothing for [Okumura] to levy."

In April 2007 the superior court denied MacDonald's motion for attorney's fees. The McLaughlins appeal.

**2. MacDonald does not have a perfected claim to an additional 40% of the McLaughlins' share of the Lougee settlement.**

█ As Okumura pointed out below, MacDonald was served with a document in which counsel for the bankruptcy trustee clearly stated to the bankruptcy court: "There is no overlap between the attorney fees owed attorneys MacDonald and Flanigan. In other words, *MacDonald will not claim an attorney fee on any recovery from the Lougee litigation.*" (Emphasis added.) If MacDonald did not agree with this seemingly unambiguous statement, he had the opportunity to correct it. But the bankruptcy court approved Flanigan's fee agreement as well as the Lougee settlement and payout schedule with no objection from MacDonald and no indication of the existence of a side agreement under which MacDonald would receive a separate 40% fee from the McLaughlins' share of the settlement on top of Flanigan's 40% fee.

Moreover, as Okumura noted below, if MacDonald were to recover his requested fees, the McLaughlins' share of the Lougee settlement would have been subject to the separate contingency fees of two attorneys—that is, the McLaughlins' share of the Lougee settlement would have been reduced first by the payment of a 40% fee to Flanigan, and then further reduced by the payment of a 40% fee to MacDonald, for a total fee of 64%. The fact that under such an arrangement the McLaughlins would be entitled to only 36% of the money recovered on their behalf (leaving aside Okumura's claim to it) is enough to cast serious doubt on MacDonald's claim for fees. If both the Robson and Lougee causes of action had been pursued by the same attorney, that attorney would not be entitled to recover two separate 40% contingency fees from the Lougee settlement proceeds absent a very clear agreement to that effect. No such clear agreement was shown to the superior court or to this court on appeal.

Lastly, MacDonald has not demonstrated that he has a properly perfected statutory attorney's lien. The only statutory lien provision possibly applicable to this case is AS 34.35.430(a)(4), which allows for an attorney's lien "upon a judgment . . . from the giving of notice of the lien to the party against whom the judgment is given and filing the original with the clerk where the judgment is entered and docketed." MacDonald obtained a judgment against Robson on behalf of the McLaughlins, but there is no evidence that he ever perfected a statutory attorney's lien on that judgment. The only "attorney's lien" in the record is inexplicably captioned with Okumura's original 1992 lawsuit against the McLaughlins rather than the McLaughlins' lawsuit against Robson, and it was apparently recorded rather than filed with the clerk of court. MacDonald had the burden of showing that he had a valid, properly perfected attorney's lien that would cover the Lougee settlement proceeds. He did not do so.

Accordingly, the superior court did not err in denying MacDonald's claim for an additional 40% fee on the McLaughlins' share of the Lougee settlement.

**V. CONCLUSION**

For the foregoing reasons, we AFFIRM the superior court's grant of Okumura's request for a new writ of execution, as well as the superior court's refusal to prevent Okumura from executing on Pamela McLaughlin's Fairbanks real estate. We also AFFIRM the superior court's denial of MacDonald's request for attorney's fees in the amount of 40% of the McLaughlins' share of the Lougee settlement proceeds.